Matter of Kaitlyn SS. (Antonio UU.) (2020 NY Slip Op 03435)





Matter of Kaitlyn SS. (Antonio UU.)


2020 NY Slip Op 03435


Decided on June 18, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: June 18, 2020

527811 528098

[*1]In the Matter of Kaitlyn SS. and Others, Alleged to be Neglected Children. Ulster County Department of Social Services, Respondent; Antonio UU., Appellant. (Proceeding No. 1.)
In the Matter of Kaitlyn SS. and Others, Alleged to be Neglected Children. Antonio UU., Appellant; Ulster County Department of Social Services et al., Respondents. (Proceeding No. 2.)

Calendar Date: May 22, 2020

Before: Garry, P.J., Lynch, Clark, Devine and Reynolds Fitzgerald, JJ.


Michelle I. Rosien, Philmont, for appellant.
Ulster County Department of Social Services, Kingston (Daniel Gartenstein of counsel), for Ulster County Department of Social Services, respondent.
Betty J. Potenza, Highland, for Tamara EE., respondent.
Marcia Heller, Rock Hill, attorney for the children.



Lynch, J.
Appeals (1) from an order of the Family Court of Ulster County (McGinty, J.), entered October 15, 2018, which granted petitioner's application, in proceeding No. 1 pursuant to Family Ct Act article 10, to adjudicate the subject children to be neglected, (2) from the orders of protection entered thereon, and (3) from an order of said court, entered November 19, 2018, which dismissed petitioner's application, in proceeding No. 2 pursuant to Family Ct Act article 10, to modify an order of supervision.
Antonio UU. (hereinafter the father) and respondent Tamara EE. (hereinafter the mother) are the parents of three children, the youngest of whom is the father's biological child (born in 2012), while the oldest child (born in 2001) and the middle child (born in 2003) are the father's stepchildren, for whom he is legally responsible. In August 2017, the Ulster County Department of Social Services (hereinafter DSS) filed a neglect petition, alleging that the father had a history of ongoing domestic violence with the mother in the presence of the children, threatened the mother and the children and was physically aggressive towards one of the children (proceeding No. 1). Following a fact-finding hearing, Family Court issued an order of disposition in October 2018, finding that the father had neglected the children. The court ordered the father to, among other things, attend and meaningfully participate in an EVOVLE domestic violence program or another similar program approved by DSS and required his visitation with the children to be supervised by DSS or a DSS-approved supervisor. The court also issued orders of protection against the father, which required him to stay away and refrain from communicating with the children, except for supervised visitation.
Thereafter, the father filed a petition to modify the October 2018 order with respect to the fixed supervised visitation schedule and the requirement of physical attendance in the EVOLVE program due to his employment (proceeding No. 2). Ultimately, in November 2018, Family Court found that the father failed to show a change in circumstances since the October 2018 order and, thus, dismissed the father's petition. The father appeals the October 2018 order, the orders of protection entered thereon and the November 2018 order.[FN1]
The father contends that Family Court's finding of neglect is not supported by a sound and substantial basis in the record. We disagree. "[DSS], as the party seeking to establish neglect, [is] required to prove by a preponderance of the evidence that the child[ren]'s physical, mental or emotional condition was impaired or was imminently in danger of becoming impaired and that the actual or threatened harm to the child[ren] was a consequence of [the father's] failure to exercise a minimum degree of care in providing the child[ren] with proper supervision or guardianship" (Matter of Ellysha JJ. [Jorge JJ.], 173 AD3d 1287, 1287 [2019] [citations omitted], lv denied 34 NY3d 901 [2019]; see Nicholson v Scoppetta, 3 NY3d 357, 369 [2004]). Even a single act of domestic violence may be sufficient to establish neglect if the "child [is] present for such violence and [is] visibly upset and frightened by it" (Matter of Michael WW., 20 AD3d 609, 612 [2005]; see Matter of Jacob W. [Jermaine W.], 170 AD3d 1513, 1513 [2019], lv denied 33 NY3d 906 [2019]; Matter of Cori XX. [Michael XX.], 145 AD3d 1207, 1207 [2016]). "Family Court's findings and credibility determinations are accorded great deference and will not be disturbed unless they lack a sound and substantial basis in the record" (Matter of Jade F. [Ashley H.], 149 AD3d 1180, 1182 [2017] [internal quotation marks and citations omitted]; see Matter of Ellysha JJ. [Jorge JJ.], 173 AD3d at 1288).
At trial, a patrol officer testified that on the night of August 9, 2017, a 911 call came in concerning a domestic dispute at a residence in the Hamlet of Tillson, Ulster County. According to the patrol officer, the caller reported that "his father displayed a handgun towards his mother, may be fleeing the scene and [the father] state[d] that he will harm law enforcement if they attempt to apprehend him." The patrol officer further testified that when he arrived at the residence along with two other officers, the mother, whose hands were shaking and who appeared "very nervous, [and] very distraught," told him that "it's [the father], he left in his gray pickup truck, he's in possession of two handguns." The patrol officer then observed the oldest child and the youngest child inside a vehicle in the driveway and the middle child "running around very frantically." Upon entering the home, the patrol officer observed that the master bedroom was messy, the closet door was open and contained "several rifles." He also noticed that the middle child's bedroom door "jamb" was damaged, and the mother informed the patrol officer that it was broken during an altercation between her and the father. According to the patrol officer, the mother informed him that the father had thrown a knife at her that evening, but missed, and then pulled a gun from the top of the refrigerator and pointed it at her. The mother also said that the father choked her the day before because she failed to keep the house clean and cook meals for him. That night, the mother completed a Domestic Incident Report, along with a supporting deposition — which were entered into evidence — restating how the August 2017 incident occurred, as well as noting that there were prior instances of domestic violence by the father in the presence of the children. The patrol officer also spoke with the middle child, who confirmed that he heard the parents fight and then called 911. The patrol officer's testimony was corroborated by a deputy at the Ulster County Sheriff's Office, who also responded to the residence on the night of the incident.
A detective at the Ulster County Sheriff's Office testified that she — along with another detective — visited the residence to take photographs and conduct interviews. The photographs admitted into evidence depicted damage to the residence allegedly caused by the father during the domestic altercations. The mother disclosed to the detective that for a period of about two years, the father became very controlling and began isolating her from her friends. The mother also informed the detective of various prior incidents in which the father perpetrated violence against her. The detective also interviewed the middle child. During that interview, as to the August 2017 incident, the middle child stated that he heard the father call the mother offensive terms and heard the knives being "unsheathed." Then, the middle child heard the mother say, "[C]all 911, [the father is] holding a gun at my head," at which point he did. Additionally, the detective testified that the middle child told her that, in June 2017, he was arguing with the father when the father slapped him and told him to never question him again. The middle child also described another incident that occurred months before the August 2017 incident, when he exited his room and observed the father "choking and punching" the mother, then the father grabbed a knife and "chased [the middle child]."
A Child Protective Services caseworker at the Family and Child Advocacy Center testified that she received a report on August 9, 2017 regarding this domestic violence incident. The caseworker then met with the mother, who explained to the caseworker that, on the evening of the incident, she came home and told the father that she wanted to go out for dinner; the father called her derogatory names, threw a knife at her, which did not hit her, and then pointed a gun at her. All of this occurred while the children were in their rooms in the house. Then, the middle child came to the mother and informed her that he had called 911, at which point the father left. The mother also disclosed to the caseworker prior incidents of domestic violence, some of which occurred in the presence of the children. She also interviewed the oldest child, who, with regard to the August 2017 incident, corroborated the mother's statements and stated that the mother had shared with her other instances of domestic violence and that she was present during one of the instances. The middle child also disclosed to the caseworker a recollection of the August 2017 incident and stated that he called the police. The middle child also stated that he had observed other instances of domestic violence, that the father had called him names and that there were physical instances between him and the father.
The mother testified — inconsistently with her prior statements and interviews — that, although she did have a "verbal argument" with the father at the residence on the evening of the incident, at no point during this argument did she fear for her well-being. She also testified that her children were not present in the room at any point during her argument with the father. She explained that the statement she gave to the officers was signed under threats.[FN2] The father similarly testified that he had a "heated verbal altercation" with the mother on the evening of the incident at issue, but denied ever threatening to kill anyone or throwing a knife or pointing a handgun at the mother. He also denied any prior incidents of domestic violence or threats.
The oldest child, who was 17 years old at the time of the hearing, testified to having a "[v]ery good" relationship with the father. She testified that the father does not discipline her and that she has never seen the father strike the middle child. She further testified that, to her knowledge, neither of her siblings has ever appeared afraid of the father. According to the oldest child, she has never seen the father choke, point a gun at or throw large objects or a knife at the mother. As to the August 2017 incident, the oldest child testified that there were no knives missing from the knife block when she went to the kitchen and that she did not hear any raised voices between the mother and the father. As to her interview with the police, she stated that she was "forced" by the interviewer to say what he wanted her to say and felt like the officers had "a personal grudge against [the father] for some reason." On cross-examination, the oldest child admitted that the father has called her offensive names and yelled at her. She also acknowledged that the father had made her cry before. She further admitted that the father had rules against calling 911 in his house and that the mother and the father had a history of verbal altercations, some of which caused the oldest child to become upset, sometimes to the point that she was not able to sleep at night. The oldest child also testified that she has heard the father call the mother offensive names. When asked if she lied to the caseworker who interviewed her just days after the alleged incident, the oldest child invoked her Fifth Amendment privilege against self-incrimination.
In our view, Family Court's finding that DSS established neglect by a preponderance of the evidence is supported by a sound and substantial basis in the record (see Matter of Boryana D. [Victoria D.], 157 AD3d 1011, 1012-1013 [2018]). There was ample evidence in the record that the father had committed multiple acts of domestic violence against the mother while the children were present and that they witnessed or heard the altercations and were visibly upset by them, which is sufficient to establish neglect under these circumstances (see Matter of Maggie YY. [Lisa ZZ.], 172 AD3d 1562, 1563 [2019]; Matter of Cheyenne OO., 135 AD3d 1096, 1098 [2016]). To the extent that there was conflicting testimony at trial, we defer to the court's credibility determinations (see Matter of Jade F. [Ashley H.], 149 AD3d at 1182).[FN3]
Next, the father takes issue with the conditions of the dispositional order. "A dispositional order must reflect a resolution consistent with the best interests of the children after consideration of all relevant facts and circumstances, and must be supported by a sound and substantial basis in the record" (Matter of Emmanuel J. [Maximus L.], 149 AD3d 1292, 1296 [2017] [internal quotation marks, brackets and citations omitted]; see Matter of Gloria DD. [Brenda DD.], 99 AD3d 1044, 1045 [2012]). At the dispositional hearing, a second Child Protective Services caseworker testified that she was assigned to the case in April 2018. The second caseworker testified that, although she had made efforts to contact the father and the children, she was not successful. She stated that the father has not shown up to any of the visitations with the children nor reached out to reschedule them. The father also did not engage in any services. She explained that she was concerned for the safety of the children, but was not able to visit them or talk to them due to the lack of cooperation. The second caseworker also recalled an incident after the fact-finding hearing when the father used inappropriate language with her and made her feel unsafe and threatened. DSS was requesting, among other things, a one-year order of supervised visitation and that the father participate and successfully complete a domestic violence program. After carefully considering the best interests of the children, Family Court issued a dispositional order which, among other things, ordered the father to attend and meaningfully participate in the EVOVLE or a similar program and required his visitation with the children to be supervised by DSS or a DSS-approved supervisor.
In light of the father's acts of domestic violence against the mother in the presence of the children and his lack of cooperation with DSS, we find that the conditions imposed in the dispositional order were in the best interests of the children and that the order is supported by a sound and substantial basis in the record (see Matter of Walter TT. v Chemung County Dept. of Social Servs., 132 AD3d 1170, 1171 [2015]; Matter of Kaleb U. [Heather V.—Ryan U.], 77 AD3d 1097, 1100 [2010]).[FN4]
Finally, the father contends that Family Court improperly dismissed his modification petition as he could not attend the EVOLVE program due to his employment. Pursuant to Family Ct Act § 1061, Family Court has broad authority to set aside, modify or vacate any order issued during the course of a Family Ct Act article 10 proceeding for "good cause shown" (see Matter of Andreija N. [Michael N.], 177 AD3d 1236, 1237 [2019]). Here, the father failed to show that he made any effort to attend the required program, as such, there is no good cause to modify the October 2018 order, and his petition was properly dismissed (see Matter of Bernalysa K. [Richard S.], 118 AD3d 885, 885 [2014]). The father's remaining contentions, to the extent that they are not specifically addressed here, have been examined and found to be without merit.
Garry, P.J., Clark, Devine and Reynolds Fitzgerald, JJ., concur.
ORDERED that the orders are affirmed, without costs.



Footnotes

Footnote 1: We granted the father's motion to hear the appeals together.

Footnote 2: To the vast majority of questions, the mother invoked her Fifth Amendment right against self-incrimination.

Footnote 3: The father failed to preserve his challenge to the mother's alleged hearsay statements in the Domestic Incident Report and the supporting deposition, as he did not challenge their admission (see Matter of Diamond Tyneshia B. [Aisha K.], 109 AD3d 740, 741 [2013]). To the extent that the father contends that Family Court erred in relying on the mother's "inaccurate" statements, the mother's repudiation of her prior statements does not render them inadmissible, rather it presented a credibility issue for the finder of fact to resolve.

Footnote 4: The father failed to substantiate his allegations that the conditions in the order were conflicting.